IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN DANNENBERG,

     Petitioner,

  v.

STEVEN ORNOSKI, Warden,

     Respondent.

_____/

ARNOLD SCHWARZENEGGER, Governor,
BOARD OF PAROLE HEARINGS,

     Real Parties in Interest.

_____/

No. C 06-00403 CW

ORDER DENYING
PETITION FOR WRIT OF
HABEAS CORPUS

    Petitioner John Dannenberg, an inmate in a California state prison, represented by counsel, filed this petition for a writ of habeas corpus based on the 1999 decision of the Board of Parole Hearings (Board) that Petitioner was unsuitable for parole. Respondent Steven Ornoski opposes the petition. Petitioner has filed a traverse. Having considered all of the papers filed by the parties, the Court DENIES the petition for a writ of habeas corpus.

BACKGROUND

    The following facts are taken from the California Supreme Court's opinion, In re Dannenberg, 34 Cal. 4th 1061 (2005).

    In 1986, Petitioner was convicted by a jury of the second degree murder of his wife. Id. at 1072. He was sentenced to prison for fifteen years to life. Id. Taking into consideration Petitioner's allowance for pretrial and prison conduct credits, his minimum eligible parole release date was June 25, 1996. Id. The

United States District Court

For the Northern District of California

Board held hearings on Petitioner's parole eligibility in 1994, 1997 and 1999.  <u>Id.</u>  Each time, the Board declined to set a parole release date for Petitioner based primarily on the nature of the commitment offense.  <u>Id.</u>  At the 1999 Board decision, which is at issue in this petition, Petitioner had been in prison for approximately thirteen years.  The Board considered the following circumstances of the commitment offense.

Petitioner and his wife, Linda Dannenberg, had been experiencing marital difficulties for a number of years.  <u>Id.</u>  They were seeing a marriage counselor and Linda Dannenberg was seeing an individual counselor regarding violence to herself and her children.  <u>Id.</u>

On May 15, 1985, at approximately 9:00 a.m., police officers were summoned to the residence of Petitioner and his wife.  <u>Id.</u>  In a bathroom, they found Linda Dannenberg's body, draped over the side of the bathtub with her head underwater in the tub.  <u>Id.</u>  Petitioner gave officers the following explanation.  At approximately 7:00 a.m., Petitioner was preparing a bath for his son and he noticed debris in the drain that could cause a clog.  <u>Id.</u>  He then got a pipe wrench and a screwdriver to fix a leaky toilet valve.  <u>Id.</u>  Petitioner must have said something to his wife about the drain.  <u>Id.</u>  She came into the bathroom, picked up the screwdriver, and a heated argument ensued.  <u>Id.</u>  She jabbed the screwdriver at Petitioner, cutting his arm, and clawed and scratched his forearm with her fingernails.  <u>Id.</u>  Petitioner tried to defend himself with his bare hands, but then picked up the pipe wrench and hit his wife on the side of the head.  <u>Id.</u> at 1073.

2

United States District Court
For the Northern District of California

When she continued to advance on Petitioner, he hit her a couple of more times in the head and she fell to the floor.  Id.  Petitioner collapsed and "may have passed out."  Id.  When he awoke, Petitioner checked his wife's pulse but could not find one and called 911.  Id.

At the 1999 hearing before the Board, Petitioner provided additional details of the circumstances of the murder.  When Linda collapsed to the floor, Petitioner collapsed as well.  Id.  Linda was lying on her back, holding the screwdriver, and Petitioner was kneeling over her, pinning her arms down.  Id.  She seemed to relax, but then placed her feet against Petitioner's shoulders and pushed so that Petitioner was knocked back against the bathroom door and fell to the floor.  Id.  Petitioner remembered nothing after that until he saw his wife lying on the edge of the tub and a pool of blood covering the floor where she had previously lain.  Id.  From where he was lying on the floor, Petitioner could not tell that his wife's head was in the water of the bathtub.  Id.  He reached over to take her pulse, but did not feel anything.  Id.  He then got to his feet, went to his bedroom and called 911.  Id.

In response to questions from members of the Board, Petitioner denied placing his wife in the bathtub.  Id.  Petitioner repeated his trial theory that his wife must have tried to rise on her own, climbed over the edge of the tub and either tried to wash herself or tried to get up, slipped, got her face in the water and hit her head on the spout when she jerked her head up out of the water.  Id.  As a result of hitting her head on the spout, she went down in the water again and drowned.  Id.  Petitioner reiterated that he

3

United States District Court
For the Northern District of California

could not have moved her into the tub without walking in the blood on the bathroom floor which would have made a mess of the murder scene.  Id.  Petitioner expressed remorse for causing his wife's death, but denied any intention to kill her.  Id. at 1074.  He emphasized that he had been charged with first degree premeditated murder but was convicted only of second degree murder.  Id.

In addition to Petitioner's testimony, the Board reviewed documents establishing that, except for the commitment offense, he had no criminal or drug history, and that while he was in prison, he was discipline-free and had pursued all recommended therapy, vocational training, and self-help programs.  Id.  Petitioner stated that he accepted responsibility for his wife's murder.  Id. He stated that he had college degrees in mathematics and engineering, had several offers of housing, sufficient liquid assets to support himself after he was released from prison, and an offer of employment.  Id.

Petitioner's May, 1999 psychological evaluation described him as a model prisoner, concluding that the murder was a one-time response to extreme stress and fear of his wife's rage while she was armed with the screwdriver.  Id.  This evaluation, like previous ones, diagnosed Petitioner with no signs of mental or emotional disorder and concluded he presented a low risk of further violence.  Id.

In concluding that Petitioner was unsuitable for parole, the Board stated that "the primary reason is the commitment offense itself."  Id.  The Board found the murder was committed in "an especially cruel or callous manner, and demonstrated a callous

4

disregard for human suffering."   _Id._   The Board cited the autopsy
report which "indicated that the victim was repeatedly struck in
the head, and at some point the victim . . . was pushed or fell
into the bathtub full of water and the eventual cause of death was
drowning."   _Id._   The Board also found that the motive for the crime
"was inexplicable or very trivial in relation to the offense."   _Id._
Although the Board found that "there were no psychiatric factors to
consider," it concluded that Petitioner "needs therapy in order to
face, discuss, understand, and cope with stress in a nondestructive
manner.  Until progress is made, the prisoner continues to be
unpredictable and a threat to others."   _Id._ at 1075.   In separately
ruling that the next parole hearing would be postponed for two
years, the Board added that Petitioner "needs to accept full
responsibility for the crime . . . and discontinue his attempts to
minimize his responsibility for that."   _Id._

                    PROCEDURAL BACKGROUND

     Petitioner filed a petition for a writ of habeas corpus in
superior court, contesting the outcome of his 1999 parole hearing.
After an evidentiary hearing, the court granted relief, finding "no
basis for the Board's determination that Dannenberg was unsuitable,
on grounds of public safety, for an otherwise mandatory parole
date."   _Id._ The court based its decision on the grounds that
Petitioner had no criminal history, he had shown remorse for the
commitment offense, his prison record and post-release plans were
excellent, prison psychologists found no mental or emotional
disorder and there was no evidence he needed therapy.   _Id._ The
court also disagreed with the Board's finding that unsuitability

United States District Court
For the Northern District of California

for parole could be based on the nature of the commitment offense, because there was no evidence that Petitioner's offense was more callous, cruel or indifferent to human suffering than other second degree murders.  Id. at 1076.  The court also found that the Board's reliance on Petitioner's failure to accept responsibility violated California Penal Code § 5011(b).  Id.[1]

The appellate court affirmed in part and reversed in part. Id.; see In re Dannenberg, 102 Cal. App. 4th 95 (2002) rev'd, 35 Cal. 4th 1061 (2005).  The appellate court interpreted California Penal Code § 3041[2] to mean that, when determining a life prisoner's parole suitability, the Board must first compare his or her crime to other similar offenses of the same class, taking into account the minimum term to which the inmate was sentenced.  Id.  The appellate court held that the Board erred by failing to conduct a

---

[1]California Penal Code § 5011(b) provides: "The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."

[2]California Penal Code § 3041 provides, in relevant part:

(a) One year prior to the inmate's minimum eligible parole release date, a panel of two or more commissioners or deputy commissioners shall . . . meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . .

(b) The panel or the board, . . . shall set a release date unless it determines that the gravity of the current convicted offense or offenses, . . . is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

6

United States District Court
For the Northern District of California

comparative analysis before finding Petitioner unsuitable for parole and agreed with the superior court that no evidence supported the Board's finding that Petitioner needed more therapy and that the Board could not penalize Petitioner for insisting he did not drown his wife. Dannenberg, 34 Cal. 4th at 1076.

The California Supreme Court granted review limited to the question of whether the Board must engage in a comparative proportionality analysis with respect to offenses of similar gravity and deny a parole date solely on the circumstances of the commitment offense only when it is particularly egregious, or whether the Board may first determine if the inmate is suitable for parole because he or she is no longer a threat to public safety and engage in a proportionality analysis only if it finds the inmate suitable. Id. at 1077.

The California Supreme Court held that, so long as the Board's finding is supported by some evidence,

> the overriding statutory concern for public safety in the
> individual case trumps any expectancy the indeterminate life
> inmate may have in a term of comparative equality with those
> served by other similar offenders.  Section 3041 does not
> require the Board to schedule such an inmate's release when it
> reasonably believes the gravity of the commitment offense
> indicates a continuing danger to the public, simply to ensure
> that the length of the inmate's confinement will not exceed
> that of others who committed similar crimes.

Id. at 1084.  The California Supreme Court concluded that

> "the nature of the prisoner's offense, alone, can constitute
> sufficient basis for denying parole". . . . While . . . the
> Board . . . may [not] adopt a blanket no-parole policy for
> particular offenses, . . . "the [parole] authority properly
> may weigh heavily the degree of violence used and the amount
> of viciousness shown by a defendant."

Id. at 1094 (quoting In re Rosenkrantz, 29 Cal. 4th 616, 682

7

(2002)).  However, an offense must be "particularly egregious" to justify the denial of parole.  Id. at 1095.

Addressing the Board's ruling in Petitioner's case, the California Supreme Court noted the Board had

> pointed to circumstances of the inmate's offense suggesting viciousness beyond the minimum elements of second degree murder.  As the Board noted, Dannenberg reacted with extreme and sustained violence to a domestic argument.  He struck multiple blows to his wife's head with a pipe wrench. Bleeding profusely, she then 'fell or was pushed' into a bathtub full of water, where she drowned.  Though he vehemently denied it, the evidence permitted an inference that, while the victim was helpless from her injuries, Dannenberg placed her head in the water, or at least left it there without assisting her until she was dead.  The parole panel's questions to Dannenberg showed its reasonable skepticism about his surmise that, while he was briefly unconscious during their struggle, the victim crawled to the tub, placed her face under the faucet, accidentally struck her head on the tap, and fell into the water.

Id.

The Court also explained,

> One who is legally convicted has no vested right to the determination of his sentence at less than maximum. Moreover, a defendant under an indeterminate sentence has no vested right to have his sentence fixed at the term first prescribed by the [parole authority] or any other period less than the maximum sentence provided by statute. . . . [T]he indeterminate sentence is in legal effect a sentence for the maximum term subject only to the ameliorative power of the [parole authority] to set a lesser term.
>
> We therefore hold that the Board proceeded lawfully when, without comparing Dannenberg's crime to other second degree murders, to its base term matrices, or to the minimum statutory prison term for that offense, the Board found him unsuitable to receive a fixed and uniform release date by pointing to some evidence that the particular circumstances of his crime -- circumstances beyond the minimum elements of his conviction -- indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety.

Id. at 1097-98 (citations omitted).

8

The California Supreme Court reversed the judgment of the appellate court and denied Petitioner relief.  Petitioner proffers a number of arguments supporting his claim that the California Supreme Court's decision was unconstitutional.[3]

LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Challenges to purely legal questions resolved by the state court are reviewed under § 2254(d)(1); the question on review is (a) whether the state court's decision contradicts a holding of the

---

[3]Petitioner mentions that he has been before the Board three more times since 1999 and that these hearings are relevant to the determination of this petition.  However, the only hearing before this Court is the 1999 hearing.  The Court cannot consider any hearings that took place subsequent to the 1999 hearing.

In a subsequent state habeas petition, Petitioner challenged the Governor's reversal of the Board's 2005 decision to grant Petitioner parole.  See In re Dannenberg, 156 Cal. App. 4th 1387, 1391 (2007), review granted February 13, 2008.  The California court of appeal concluded that the Governor's reversal of the Board's decision to grant parole was not supported by some evidence and granted the petition.  Id. at 1401.  The California Supreme Court granted review on February 13, 2008.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Supreme Court or reaches a different result on a set of facts materially indistinguishable from those at issue in a decision of the Supreme Court; or (b) whether the state court, after identifying the correct governing Supreme Court holding, then unreasonably applied that principle to the facts of the prisoner's case. Lambert v. Blodgett, 393 F.3d 943, 978 (9th Cir. 2004). The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991).

Challenges to purely factual questions resolved by the state court are reviewed under § 2254(d)(2); the question on review is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding is supported by the record. Lambert, 393 F.3d at 978.

DISCUSSION

I.  Federal Due Process Right to Parole

Petitioner argues that the California Supreme Court in Dannenberg found that he had no federal due process right to parole.

The Ninth Circuit has specifically addressed Petitioner's argument that Dannenberg had held that he had no right to parole. See Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006). In Sass, the Ninth Circuit stated that, in Dannenberg, the California Supreme Court

> did not hold that § 3041(b) does not use mandatory language. . . . The court explained that [Dannenberg] has such a liberty interest and expectation only to the extent that state law provides it, but did not hold that state law does not provide such a liberty interest.

10

United States District Court
For the Northern District of California

1          Instead, the court proceeded to the second step of the
2     due process analysis -- whether the procedures attendant
      upon a deprivation were constitutionally sufficient
3     . . . . The court would not reach this step if it had
      held that there was no liberty interest. <u>Dannenberg</u> does
4     not explicitly or implicitly hold that there is no
      constitutionally protected liberty interest in parole.

<u>Id.</u>

Because the Ninth Circuit has specifically spoken on this

issue, Petitioner's argument that the <u>Dannenberg</u> opinion denied

that he has a due process right to parole is unavailing.[4]

II. Some Evidence Standard

     The Supreme Court has clearly established that a parole

board's decision deprives a prisoner of due process with respect to

his constitutionally protected liberty interest in a parole release

date if the board's decision is not supported by "some evidence in

the record," or is "otherwise arbitrary." <u>Id.</u> (citing

<u>Superintendent v. Hill</u>, 472 U.S. 445, 457 (1985)).  When assessing

whether a state parole board's suitability determination was

supported by "some evidence," the court's analysis is framed by the

statutes and regulations governing parole suitability

determinations in the relevant State. <u>Id.</u> Accordingly, in

California, the court must look to California law to determine the

findings that are necessary to deem a prisoner unsuitable for

parole, and then must review the record to determine whether the

state court decision constituted an unreasonable application of the

"some evidence" principle. <u>Id.</u>

---

    [4]<u>Sass</u> was published on August 31, 2006.  Petitioner's petition
was filed on January 20, 2006.  Therefore, Petitioner did not have
the benefit of the Ninth Circuit's opinion when he submitted his
petition.  In his traverse, filed on May 21, 2007, Petitioner does
not address this aspect of the <u>Sass</u> opinion.

**United States District Court**
For the Northern District of California

Petitioner argues that the California Supreme Court and the lower state courts applied the wrong level of evidentiary review when analyzing the Board's decision. Petitioner argues that the "some evidence" standard articulated by the United States Supreme Court in <u>Hill</u> does not apply to California's parole hearing process. Instead, Petitioner argues that "the statutory language of Cal. Pen. Code § 3041 creates a presumption of parole suitability, which then shifts the burden to the state to prove by a preponderance of the evidence that the inmate fits within the § 3041(b) public safety exception to the mandatory duty to set a parole date." Petition at 31. To support this argument, Petitioner cites California Evidence Code § 115 which provides, in relevant part, "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." Petitioner also cites California Code of Regulations, title 15, § 3320(l), which addresses disciplinary hearings and which provides, in relevant part, "Any finding of guilt shall be based upon determination by the official(s) conducting the disciplinary hearing that a preponderance of evidence submitted at the hearing substantiates the charge." Petitioner reasons that, because neither the California Penal Code nor the California Code of Regulations directly prescribes a standard of review for parole consideration hearings, California Code of Evidence § 115 applies, which provides a preponderance standard. Petition at 40. Petitioner distinguishes California law from the Massachusetts law the Supreme Court was addressing in <u>Hill</u> because the Massachusetts statutory code did not provide an evidentiary standard and the

California statutory code provides a preponderance standard. Petition at 39.  From this, Petitioner postulates that the "traditional 'substantial evidence' review should be utilized," and "the Board's decision cannot survive scrutiny under this level of analysis, since . . . there is no evidence to sustain the Board's findings."  Petition at 40.

Under AEDPA, this Court must review the ruling of the highest state court that has issued a reasoned decision on the petition, not the Board's decision.  Thus, this Court must decide whether the California Supreme Court's opinion was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  The Ninth Circuit has applied the Hill standard of review to California parole hearings and has provided the following procedure for a federal habeas court to review a parole suitability determination:

> When we assess whether a state parole board's suitability determination was supported by "some evidence" in a habeas case, our analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state.  Accordingly, here we must look to California law to determine the findings that are necessary to deem a prisoner suitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" . . . constituted an unreasonable application of the "some evidence" principle articulated in Hill.

Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007).  The California Supreme Court accurately identified this federal standard in its analysis of Petitioner's state petition.  See Dannenberg, 34 Cal. 4th at 1084.

Therefore, the state court's use of this standard was not

**United States District Court**
For the Northern District of California

contrary to or an unreasonable application of established federal law as determined by the United States Supreme Court.

III. Unconstitutional Vagueness

Petitioner argues that, as interpreted by the California Supreme Court in Dannenberg, the California regulations that permit a finding of unsuitability for parole based on the commitment offense are unconstitutionally vague as applied to him. Petition at 41.

In general, construction of a state statute by the state supreme court must be treated as if it had been incorporated into the words of the statute. Knapp v. Cardwell, 667 F.2d 1253, 1260 (9th Cir. 1982) (citing Pulos v. New Hampshire, 345 U.S. 395, 402 (1953)). State courts have the final authority to interpret that State's legislation. Id. "Federal courts will not review a state supreme court's interpretation of its own statute unless that interpretation is clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state of rights guaranteed by the Constitution." Id. (citing Mullaney v. Wilbur, 421 U.S. 684, 691 n.11 (1975), and other United States Supreme Court authority).

An enactment is void for vagueness under the constitutional principle of due process if its prohibitions are not clearly defined. Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). This is because laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited. Id. Also, laws must provide explicit standards to those who apply them so they may not be enforced in an arbitrary and discriminatory manner. Id. at

14

109.   Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis.  Maynard v. Cartwright, 486 U.S. 356, 361 (1988).

The following is the California regulatory scheme that is relevant to Petitioner.  California Penal Code § 3041, quoted above, requires that a parole date normally be set for prisoners unless various factors exist.  Specifically, one year prior to a prisoner's minimum eligible release date, a panel of the Board shall normally set a parole release date "unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual."  Cal. Penal Code § 3041(b).

California Code of Regulations, title 15, § 2402 sets forth the criteria for determining whether an inmate is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if, in the judgment of the panel, the prisoner will pose an unreasonable risk of danger to society if released from prison.  Cal. Code Regs. tit. 15, § 2402(a).  California Code of Regulations, title 15, § 2402(c) and (d) provide the factors that tend to show unsuitability or suitability for parole.  The circumstances tending to show unsuitability include: (1) whether the commitment offense was committed in "an especially heinous, atrocious or cruel manner"; (2) the prisoner's previous record of violence; (3) "a

**United States District Court**
For the Northern District of California

history of unstable or tumultuous relationships with others";
(4) commission of "sadistic sexual offenses"; (5) "a lengthy
history of severe mental problems related to the offense"; and
(6) "serious misconduct in prison or jail."  Cal. Code Regs. tit.
15, § 2402(c).

A finding that the inmate is an unreasonable risk to society
can be made solely on the basis of the commitment offense only if
the offense is "especially heinous, atrocious, or cruel."  Cal.
Code Regs. tit. 15, § 2402(c)(1).  Factors to be considered in
determining whether an offense is especially heinous, atrocious, or
cruel are (A) whether multiple victims were involved in the crime
or other crimes; (B) whether the offense was carried out in a
dispassionate and calculated manner, such as an execution-style
murder; (C) whether the victim was abused, defiled or mutilated
during or after the offense; (D) whether the offense was carried
out in a manner which demonstrates an exceptionally callous
disregard for human suffering; and (E) whether the motive for the
crime is inexplicable or very trivial in relation to the offense.
Cal. Code Regs. tit. 15, § 2402(c)(1).

The California Supreme Court first interpreted these
regulations in In re Rosenkrantz, 29 Cal. 4th 616 (2002).  In
Rosenkrantz, the California Supreme Court stated that "the nature
of the prisoner's offense, alone, can constitute a sufficient basis
for denying parole" and "the [parole] authority properly may weigh
heavily the degree of violence used and the amount of viciousness
shown by a defendant."  29 Cal. 4th at 682-83.  The court
explained:

United States District Court
For the Northern District of California

> In some circumstances, a denial of parole based upon the
> nature of the offense alone might rise to the level of a
> due process violation--for example where no circumstances
> of the offense reasonably could be considered more
> aggravated or violent than the minimum necessary to
> sustain a conviction for that offense.  Denial of parole
> under these circumstances would be inconsistent with the
> statutory requirement that a parole date normally shall
> be set "in a manner that will provide uniform terms for
> offenses of similar gravity and magnitude in respect to
> their threat to the public." . . . "The Board's authority
> to make an exception [to the requirement of setting a
> parole date] based on the gravity of a life term inmate's
> current or past offenses should not operate so as to
> swallow the rule that parole is 'normally' to be granted.
> Otherwise, the Board's case-by-case rulings would destroy
> the proportionality contemplated by Penal Code section
> 3041, subdivision (a), and also by the murder statutes,
> which provide distinct terms of life without possibility
> of parole, 25 years to life, and 15 years to life for
> various degrees and kinds of murder.  Therefore, a life
> term offense or any other offenses underlying an
> indeterminate sentence must be particularly egregious to
> justify the denial of a parol date."

Id. at 683 (citations omitted).

In its Dannenberg opinion, the California Supreme Court discussed Rosenkrantz at length.  Dannenberg, 34 Cal. 4th at 1094-95.  The Dannenberg court emphasized that, to prevent the Board's case-by-case suitability determinations from swallowing the rule that parole should normally be granted, an offense must be particularly egregious to justify denial of parole.  Id. at 1095. The term "particularly egregious" was further defined by the court in Rosenkrantz and Dannenberg to mean that the violence or viciousness of the commitment offense was more than minimally necessary to convict the inmate of the offense for which he was confined.  Id. (quoting Rosenkrantz, 29 Cal. 4th at 683).  In reviewing the Board's decision regarding Petitioner under the standard set forth in Rosenkrantz, the Dannenberg court considered

17

in depth the facts of the commitment offense and found that it constituted some evidence to support the Board's decision that Petitioner's crime was especially callous and cruel, showed an exceptionally callous disregard for human suffering and was disproportionate to the trivial provocation.

Petitioner argues that Dannenberg established a new rule that a parole denial can be based on the crime alone so long as it involves facts which are "'more than minimally necessary to convict' the inmate of the offense in question," and that this rule is unconstitutionally vague. Petitioner also argues that this rule fundamentally alters the previous standard set by the California Supreme Court in Rosenkrantz that to deny parole, the crime must be especially heinous, atrocious and cruel. Petitioner contends that the Rosenkrantz court held that the only proper criteria for concluding that an inmate is unsuitable for parole is found in title 15, § 2402(c) of the California Code of Regulations, that the inmate currently presents an unreasonable risk of danger to society if paroled.

However, the court's finding in Dannenberg that the evidence met the "more than minimally necessary to convict" standard was in addition to its finding that the evidence met the Rosenkrantz standard that the crime was especially heinous, atrocious and cruel. According to § 2402, a finding that the inmate presents an unreasonable risk to society if paroled can be based on the finding that the commitment offense was especially heinous, atrocious or cruel. The court in Dannenberg elaborated on the standard previously set forth in Rosenkrantz and provided the lower courts

18

with additional guidance in determining if an offense was especially callous and cruel.  Furthermore, Petitioner's argument that Dannenberg changed the standard for parole denials set in Rosenkrantz is not reviewable by this Court; the California Supreme Court interprets California law and can change its interpretation.

Petitioner also argues that, in 1985, when he committed his offense, he was subject to a regulation interpreting § 3041 that placed him in a class of offenders suitable for parole and for a uniform term, so long as his offense was not outside the norm.  Petitioner contends that Dannenberg reinterpreted § 3041, expanding the class of murderers unsuitable for parole to include "normal" murderers, such as himself.  Petitioner reasons that Dannenberg did so by redefining an offense that is "especially heinous, atrocious or cruel" as encompassing those situations where there is some evidence indicating that the circumstances of the crime were beyond the minimum elements of the conviction.

Again, Petitioner incorrectly characterizes Dannenberg. Dannenberg did not change the fact that to warrant parole unsuitability based on the commitment offense alone, it must be especially heinous, atrocious or cruel.  Dannenberg merely added another factor to consider in determining whether the crime was heinous, atrocious or cruel.  Thus, Petitioner's argument that Dannenberg is unconstitutional as applied to him, because it expanded the class of offenders who could be denied parole, is unavailing.

Petitioner points out that language similar to the "heinous, atrocious and cruel" standard was found to be unconstitutional in

19

other contexts by the United States and California Supreme Courts in several death penalty cases.  See e.g., People v. Superior Court (Engert), 31 Cal. 3d 797, 803 (1982) (holding that the phrase in a criminal statute, "especially heinous, atrocious, and cruel, manifesting exceptional depravity," used to define murder with special circumstances warranting the death penalty was unconstitutionally vague and violative of due process in failing to provide an ascertainable standard of conduct); Maynard, 486 U.S. at 362 (holding that a jury instruction that a murder be found to be "especially heinous, atrocious, or cruel" violated the Eighth Amendment's requirement that a jury must be adequately informed of what it must find to impose the death penalty).  These cases are not on point.

Finally, Petitioner argues that due process is violated by Dannenberg's holding that an inmate must first be determined not to be a risk to public safety before a comparative analysis with other similar offenses need be undertaken.  Petitioner contends that, in order to determine if a crime is especially heinous, atrocious and cruel, it must be compared to similar offenses; otherwise, the regulation is unconstitutionally vague because any crime can be said to be especially heinous, atrocious and cruel.

The Dannenberg court reasoned:

This procedure, in which the suitability determination precedes any effort to calculate a parole release date, has long been noted in the case law.  Both we and the Courts of Appeal have consistently described the parole process for indeterminate life prisoners as one in which suitability for parole is within the Board's informed discretion, and must first be found before a parole date is set.  (citing cases).

20

United States District Court
For the Northern District of California

Nonetheless, the instant Court of Appeal, adhering to its own recent decision in <u>In re Ramirez</u>, 94 Cal. App. 4th 549 (2001), concluded that the Board errs by considering term uniformity only after its case-specific review persuades it that the indeterminate life inmate is safe for release on parole. . . . Thus, the Court of Appeal concluded, when addressing the issue of parole for a murderer serving a life-maximum term, the Board (1) <u>must first</u> compare the inmate's actual period of confinement with the minimum statutory confinement for the offense, and with the actual confinements served by others who have committed similar crimes, (2) <u>must</u> thereupon set a firm "uniform" release date unless it finds the public-safety exception applicable, and (3) <u>may not</u> deny parole, on grounds the commitment offense reflects a continuing threat to public safety, unless the offense is <u>particularly egregious</u> in comparison to others.

. . .

The words of section 3041 strongly suggest that the public-safety provision of subdivision (b) takes precedence over the "uniform terms" principle of subdivision (a). The statute expressly provides that the fixing of a "uniform" parole release date shall occur <u>unless</u> the Board finds the indeterminate life inmate unsuitable on grounds of "public safety."

Subdivision (b) of section 3041 states that the determination of suitability shall be based upon "the gravity of the current convicted offense . . . or the timing and gravity of current or past convicted offense or offenses." But subdivision (b) does not say that, in making this evaluation, the Board must compare the inmate's actual period of confinement with others serving life terms for similar crimes, or that it must consider term uniformity in any respect. Indeed, subdivision (b) indicates otherwise by providing that the suitability determination should focus upon the public safety risk posed by "this individual." The language and structure of section 3041 thus most logically convey that the Board need engage in comparative term analysis <u>only if</u> it first determines, applying the pertinent criteria, that the inmate presents no public safety danger, and is thus suitable for parole.

<u>Dannenberg</u>, 34 Cal. 4th at 1080-83 (emphasis in original).

As indicated above, interpretation of a state statute by the state supreme court must be treated as if it had been incorporated into the words of the statute and state courts have the final

authority to interpret that State's legislation unless that interpretation is clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the State of rights guaranteed by the Constitution.

The <u>Dannenberg</u> court's analysis of § 3041 is carefully reasoned and applies the generally accepted principles of legislative interpretation.  There is no indication that it constitutes a subterfuge to avoid federal review of California's deprivation of federal constitutional rights.

Petitioner does not provide any United States Supreme Court authority that is contrary to <u>Dannenberg</u>.  Petitioner's claim that <u>Dannenberg</u> rendered the parole regulations unconstitutionally vague as applied to him is DENIED.

IV. <u>Apprendi</u>, <u>Blakely</u>, and <u>Cunningham</u>

Petitioner argues that the Board's finding him unsuitable for parole violates his Sixth Amendment right to a jury trial as set forth by the Supreme Court in <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), <u>Blakely v. Washington</u>, 542 U.S. 296 (2005), and <u>Cunningham v. California</u>, ___ U.S. ___, 127 S. Ct. 856 (2007).  Petitioner reasons that the matrix of prison terms for various offenses set by the parole regulations establishes a presumptive prison term for each offense and, because he has been in prison longer than the time set by the matrix, his Sixth Amendment right to a jury trial was violated.

In the line of cases beginning with <u>Apprendi</u>, the United States Supreme Court established that "under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence

United States District Court
For the Northern District of California

[than the statutory maximum] must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." Cunningham, 127 S. Ct. at 863-64 (citing Apprendi, 530 U.S. at 490). The relevant statutory maximum "'is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Id. at 860 (quoting Blakely, 542 U.S. at 303-04) (emphasis in original).

The statutory maximum sentence for Petitioner's crime is life imprisonment. Cal. Penal Code § 190. Therefore, no additional facts must be found beyond those which were found by the jury at Petitioner's 1986 trial in order for him to be kept in prison for life. Petitioner has no right to a jury trial in connection with any decision whether to release him before the expiration of his life maximum term.

That the Apprendi line of cases does not apply is evidenced by the fact that an indeterminate sentencing scheme is one of the proposed solutions to the jury trial problem caused by the determinate sentencing schemes the Supreme Court has invalidated. See, e.g., Blakely, 542 U.S. at 305 (citing with approval Williams v. New York, 337 U.S. 241 (1949) (judge's consideration of facts outside the trial record to decide whether to sentence defendant to death did not violate the jury trial right because the indeterminate sentencing scheme allowed the judge to sentence defendant to death or imprisonment)). In Blakely, the Court explained that indeterminate sentencing that gives a judge great power to set sentences does not infringe on the province of the

23

United States District Court
For the Northern District of California

jury:

> It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to the lawful imposition of the penalty.  Of course, indeterminate schemes involve judicial fact-finding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal <u>right</u> to a lesser sentence--and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.

<u>Blakely</u>, 542 U.S. at 308-09 (emphasis in original).

The matrix does not set a statutory maximum term of years for a person convicted of second degree murder.  California Penal Code § 190 sets the statutory maximum for such an inmate at life imprisonment.  The Sixth Amendment right to jury trial has no applicability to the parole determination for California's murderers who are serving indeterminate life sentences.  Therefore, this claim must be DENIED.

V. Fifth Amendment Protection From Double Jeopardy

Petitioner contends that the Board's denial of parole placed him in jeopardy for the offense of first degree murder, of which he had been unanimously acquitted by the jury.

The Double Jeopardy Clause of the Fifth Amendment guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  In <u>Benton v. Maryland</u>, 395 U.S. 784, 794 (1969), these protections were held applicable to the States through the Fourteenth Amendment.  The guarantee against double jeopardy protects against (1) a second prosecution for the same offense after acquittal or conviction, and (2) multiple punishments for the same offense.  <u>Witte v. United</u>

24

United States District Court
For the Northern District of California

1  *States*, 515 U.S. 389, 395-96 (1995); United States v. DiFrancesco,

2  449 U.S. 117, 129 (1980).

3      Parole and probation are part of the original sentence;

4  therefore, decisions concerning them are not multiple punishments

5  for the original offense.  United States v. Brown, 59 F.3d 102,

6  104-05 (9th Cir. 1995) (per curiam); Lopez v. Board of Prison

7  Terms, 2005 WL 1683948, *6 (E.D. Cal.).  Thus, the California

8  Supreme Court's denial of this claim was not an unreasonable

9  application of federal law.  This claim for habeas relief must be

10  DENIED.

11  VI. Evidence Supporting Denial of Parole

12      Petitioner claims that Dannenberg's review of the facts was

13  unreasonable because there was no evidence to support the finding

14  that Petitioner would pose a danger if released.

15      The United States Supreme Court described the "some evidence"

16  standard of proof as follows.

17      The standard is met if "there was some evidence from
        which the conclusion of the administrative tribunal could
18      be deduced . . ."  Ascertaining whether this standard is
        satisfied does not require examination of the entire
19      record, independent assessment of the credibility of
        witnesses, or weighing of the evidence.  Instead, the
20      relevant question is whether there is any evidence in the
        record that could support the conclusion reached by the
21      [Board]. . . .  The fundamental fairness guaranteed by the
        Due Process Clause does not require courts to set aside
22      decisions of prison administrators that have some basis
        in fact. [Such a decision] is not comparable to a
23      criminal conviction, and neither the amount of evidence
        necessary to support such a conviction nor any other
24      standard greater than some evidence applies in this
        context.
25  
    Hill, 472 U.S. at 456.
26
        The Dannenberg court reviewed the Board's decision and, as
27

28                              25

**United States District Court**
For the Northern District of California

discussed above, determined that it was based on some evidence that

Petitioner's commitment offense was especially callous and cruel,

showed an exceptionally callous disregard for human suffering, and

was disproportionate to the trivial provocation, so that he was

unsuitable for parole for reasons of public safety. Dannenberg, 34

Cal. 4th at 440-41.

Petitioner argues that his commitment offense was "never more

than an implied malice murder, which already places it on a lesser

order than express malice (intent to kill) second degree murders."

Petition at 64. He contends that because "this was a situational,

one time offense by an otherwise nonviolent man," it will never

recur. Id. Petitioner concludes that there was no more than the

minimal amount of evidence necessary to support his conviction and,

thus, the Board and Dannenberg incorrectly found the commitment

offense to be particularly heinous, atrocious and cruel. Id.

Petitioner cites other California cases in which the court found

more egregious murders not particularly heinous. Petitioner also

argues that the Board's finding that he needed more therapy is

baseless. He contends that the evidence fails to support any of

the remaining unsuitability factors and shows that Petitioner is

suitable for parole under each factor listed in California Code of

Regulations, title 15, § 2402(d). Thus, he says, his denial of

parole was based on the commitment offense alone, and that was

insufficient.

However, Dannenberg's holding that due process was not

violated by the Board's finding, based on the commitment offense

alone, that Petitioner was unsuitable for parole, for reasons of

26

**United States District Court**
For the Northern District of California

public safety, under the standard set forth by the United States Supreme Court in <u>Hill</u>, is not contrary to or an unreasonable application of federal law or based on an unreasonable finding of the facts.

Citing <u>In re Ramirez</u>, 94 Cal. App. 4th 549 (2001), and the district court's opinion in <u>Irons v. Warden</u>, 358 F. Supp. 2d 936 (E.D. Cal. 2005), <u>rev'd</u>, <u>Irons v. Casey</u>, 505 F.3d 846 (9th Cir. 2007), Petitioner argues that only the first denial of parole may be based exclusively on the facts of the crime and "any subsequent denial requires the presence of in-prison behavior showing that the inmate currently presents an unreasonable risk of danger if paroled." Petition at 71.

In <u>Dannenberg</u>, the California Supreme Court specifically disapproved of the court of appeal's <u>Ramirez</u> decision. <u>See</u> <u>Dannenberg</u>, at 1081-87, 1100. Also, after the instant petition was filed, the Ninth Circuit reversed the district court's grant of the petition in <u>Irons</u>. <u>See</u> <u>Irons</u>, 505 F.3d at 849. The Ninth Circuit upheld the Board's finding that Irons was unsuitable for parole based on the commitment offense alone because there was "some evidence to support a finding that 'the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering' and the 'motive for the crime is inexplicable or very trivial in relation to the offense.'" <u>Id.</u> at 853.

It is true that the court may consider the parole board's decision-making process over time: "a continued reliance on an unchanging factor such as the circumstances of the commitment offense, pre-conviction criminal history, or other past conduct,

**United States District Court**
For the Northern District of California

might in some cases result in a due process violation at some

point." Hayward v. Marshall, 512 F.3d 536, 545 (9th Cir. 2008)

(citing Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003)).  In

Hayward, the Ninth Circuit overturned the Governor's reversal of

the Board's grant of parole, holding that no evidence supported the

Governor's conclusion that the release of the petitioner, who had

served twenty-seven years in prison for second-degree murder, would

threaten the public safety.  Id. at 547-48.

In Sass, 461 F.3d at 1129, the Ninth Circuit upheld a denial

of parole based on the commitment offense but reiterated that

continued reliance on an unchanging factor could result in a due

process violation.  Like Biggs, Sass had not yet completed serving

his minimum term at the time of the parole denial.  Id. at 1125;

Biggs, 334 F.3d at 912-13.

Citing Sass, the Ninth Circuit in Irons, 505 F.3d at 853,

found that relief for Irons was precluded because his offense was

more callous and cruel than Sass's.  However, the Ninth Circuit

emphasized that in all the cases in which it had held that a parole

denial based solely on the commitment offense comported with due

process, the denial had occurred before the inmate had served his

minimum sentence.  Id. at 853-54.  The court stated, "All we held

in those cases and all we hold today, therefore, is that, given the

particular circumstances of the offense in these cases, due process

was not violated when these prisoner were deemed unsuitable for

parole prior to the expiration of their minimum terms."  Id.

Because, at the time the Board issued its ruling in 1999,

Petitioner had not served the fifteen-year minimum on his fifteen-

28

**United States District Court**
For the Northern District of California

years to life second degree murder sentence, the state court's
ruling comported with the Ninth Circuit's holding in <u>Irons</u>.

Thus, the <u>Dannenberg</u> court's holding was not contrary to, or
an unreasonable application of, federal law or an unreasonable
finding of facts in light of the record evidence.  Therefore, this
claim for habeas relief is DENIED.  If, after Petitioner has served
fifteen years in custody, the Board continues to find him
unsuitable for parole, and bases its decision solely on the
commitment offense, such continued reliance may amount to a due
process violation.

CONCLUSION

Based on the foregoing, Petitioner's petition for a writ of
habeas corpus is DENIED.

IT IS SO ORDERED.

Dated: 4/14/08

_____
CLAUDIA WILKEN
United States District Judge